IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

WESTFIELD INSURANCE COMPANY,          )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               )    NO. 3:14-CV-1548
                                      )
ORTHOPEDIC AND SPORTS                 )
MEDICINE CENTER OF NORTHERN           )
INDIANA, INC., et al.,                )
                                      )
        Defendants.                   )
                                      )

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary
Judgment filed by Plaintiff Westfield Insurance Company
("Westfield"), on March 31, 2016 (DE #64). For the reasons set
forth below, Westfield's Motion for Summary Judgment (DE #64) is
**GRANTED.** The Clerk of the Court is **DIRECTED** to enter a **DECLARATORY**
**JUDGMENT** in favor of Westfield and against all defendants declaring
that no coverage exists under Commercial Package Policy No. TRA
3413228 based on the personal and advertising injury, umbrella
personal and advertising injury, bodily injury and property
damage, and umbrella bodily injury and property damage coverage
provisions, and thus, Westfield has no duty to defend or indemnify
defendants Orthopedic and Sports Medicine Center of Northern
Indiana, Inc. ("OSMC"), ASC Surgical Ventures, LLC ("ASC"), or
their physicians ("OSMC Physicians") with respect to the claims

-1-

asserted by the other individual defendants in the lawsuits filed in Elkhart Superior Court and the proposed medical malpractice complaints filed with the Indiana Department of Insurance.

BACKGROUND

NECC was a compounding pharmacy that made preservative-free methylprednisolone acetate ("MPA"). MPA is an epidural steroid medication that is administered by injection for pain management. Defendants OSMC and its affiliate ASC purchased preservative-free MPA from NECC to treat patients with back pain. In September 2012, a multistate outbreak of fungal meningitis, lumbar fungal infections and related injuries arose as a result of patients receiving injections of contaminated preservative-free MPA that had been compounded by NECC. Patients injected with the contaminated MPA suffered bodily injury or death.

Over 150 patients, spouses of patients, parents of patients, personal representatives of deceased patients, and powers of attorneys who are residents of Indiana or Michigan (together, "Individual Defendants") filed lawsuits against OSMC, ASC, and OSMC Physicians (together, "OSMC Defendants") in Elkhart Superior Court ("Lawsuits"). The Lawsuits allege the bodily injury or death of patients as a result of being injected with contaminated preservative-free MPA that had been compounded by NECC and ordered and administered by the OSMC Defendants. Most of the Individual

Defendants also filed proposed complaints with the Indiana Department of Insurance alleging similar claims ("Medical Malpractice Complaints" or "Malpractice Complaints").

The OSMC Defendants requested that Westfield defend and indemnify them against the Lawsuits and Medical Malpractice Complaints pursuant to several insurance policies. Westfield refused to defend the OSMC Defendants, and filed the instant declaratory judgment action. Westfield now moves for summary judgment, asking the Court to find that the insurance policies do not provide coverage for the claims in the Lawsuits and Medical Malpractice Complaints, and that Westfield has no duty to defend or indemnify the OSMC Defendants in those actions.

The OSMC Defendants do not oppose Westfield's motion for summary judgment. The Individual Defendants oppose this motion in part. (DE #70.) Intervenor Stephen W. Robertson, Commissioner, Indiana Department of Insurance, as Administrator of the Indiana Patients' Compensation Fund ("PCF"), filed a response to Westfield's motion for summary judgement. (DE #79.) Westfield filed reply briefs to the Individual Defendants' opposition and PCF's response brief. (DE #73, DE #80.)

On November 7, 2016, Westfield filed a notice of additional authority in support of its summary judgment motion, and attached *Robertson v. Anonymous Clinic,* 63 N.E.3d 349, 361 (Ind. Ct. App. 2016). (DE #81.) The Individual Defendants objected to the

Court's consideration of *Robertson* because the appellant PCF had filed a petition to transfer to the Indiana Supreme Court. (DE #82.) The petition to transfer was denied on February 16, 2017, and the Court of Appeals certified *Robertson* on February 22, 2017. (*See* DE #83.) Therefore, the Individual Defendants' objection is moot.

SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in her own pleading, but rather must "marshal and present the court

with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). The party with the burden of proof on an issue can obtain a summary judgment "only where the evidence is so one-sided that it points inescapably" in the movant's favor, and "every reasonable jury" would decide that the movant has met its burden of proof. *Thorne v. Member Select Ins. Co.,* 899 F. Supp. 2d 820, 824 (N.D. Ind. 2012) (citations omitted). If the non-moving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

"Interpretation of a written contract, including a contract of insurance, typically presents a question of law suitable for resolution on motions for summary judgment." *Royer v. USAA Cas. Ins. Co.,* 781 F. Supp. 2d 767, 770 (N.D. Ind. 2011) (citation omitted). "When the question presented is whether an insurance policy provides liability coverage for a particular claim or lawsuit, the central material facts are ordinarily the terms of the written contract and the contents of the plaintiff's allegations in the underlying litigation." *Id.* (citation omitted).

FACTS

The Court finds the following undisputed facts to be supported by admissible evidence in the record:[1]

OSMC operates a medical clinic in Elkhart County, Indiana. ASC is the operating entity for the clinic where OSMC's physicians perform orthopedic surgeries and pain management procedures, including epidural steroid injections. ASC ordered the epidural steroid medication that OSMC's physicians administered to patients, including MPA.

In 2005, OSMC's physicians had been administering preservative-based MPA to patients. OSMC's physicians became concerned about reports in medical literature that injections of preservative-based MPA could cause arachnoiditis and injury to the spinal cord. Based on these concerns, the physicians recommended to ASC's board of directors that they switch to using preservative-free MPA. ASC's board of directors was comprised of ASC's Chief

---

[1] The Court notes that neither the Individual Defendants nor PCF filed a "Statement of Genuine Disputes" in their response briefs or appendices as required by the Local Rules. *See* N.D. Ind. L.R. 56-1(b). While their response briefs include statements of fact, neither brief identifies material facts that they contend are genuinely disputed in connection with Westfield's Motion for Summary Judgment. This approach does not comply with Local Rule 56-1(b). The Court is "not obliged . . . to scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994). Nevertheless, the Court has attempted to sift through the parties' versions of events, determine which, if any, facts the parties dispute, and construe disputed facts in the nonmovants' favor if they provide citations to evidence in the record.

Executive Officer ("CEO") and eleven physicians who are OSMC staff members. ASC's board of directors approved the switch to preservative-free MPA.

Dr. Gene W. Grove Sr., an OSMC physician and the medical director for ASC, testified that ASC's decision to use preservative-free MPA compounded by NECC was a "medical decision" and a "medical judgment" made by himself and "other physicians on the ASC board [of directors]." (DE #67-3 at 30-31.) ASC had been using NECC, a compounding pharmacy located in Massachusetts, as a supplier of other medications, and had vetted NECC through its pharmacist consultant, Elkhart General Hospital and Elkhart General Hospital's Pharmacy and Therapeutics Committee. ASC's board of directors made the decision to use NECC as a supplier.[2] OSMC, through ASC, began ordering preservative-free MPA from NECC in approximately 2006. ASC's board of directors conducted annual

---

[2] The Individual Defendants' statement of facts (entitled, "Factual Background") does not address the OSMC Defendants' decision to use NECC as a supplier. PCF cites the testimony of Mary Kauffmann-Kennel, the OSMC employee who ordered medications from NECC, regarding this decision. Ms. Kauffmann-Kennel testified that she "[did]n't remember exactly that process [of who made the decision to use NECC as the supplier of preservative-free MPA]. My memory is because we were using them for a supplier of a couple of other things, other medications that we continued to use them for this." (DE #67-4 at 12.) Westfield cites the deposition testimony of Dr. Grove, who testified that ASC's board of directors made the decision to use NECC as a supplier, and that ASC had been using NECC as a supplier for other medications prior to supplying preservative-free MPA. (DE #67-3 at 22-23, 40-42.) The Court does not find the testimony of Ms. Kauffman-Kennel and Dr. Grove to be inconsistent.

reviews of medications used in OSMC's medical center, and approved the continued use of preservative-free MPA.

Preservative-free MPA was ordered from NECC using a prescription order form that listed each patient for each individual prescription of MPA that was ordered. This form was to be signed by a physician. Patients were injected with preservative-free MPA after they signed a consent form to receive the medical procedure.

On September 26, 2012, NECC voluntarily recalled three lots of preservative-free MPA due to fungal contamination. Contaminated MPA had been distributed to OSMC's medical center, and allegedly injected into the bodies of some OSMC patients. The Center for Disease Control and Prevention later confirmed more than 750 cases of fungal infection linked to injections of contaminated NECC-compounded MPA in 2012 and 2013, including over 350 cases within the states of Indiana and Michigan.

Lawsuits and Medical Malpractice Complaints

Beginning in April 2014, the Individual Defendants filed 26 Lawsuits against the OSMC Defendants in Elkhart Superior Court. The complaints filed in the Lawsuits ("Lawsuits' complaints") allege theories of negligence, gross negligence, negligent misrepresentation and omission, negligence per se for violation of Indiana Code § 16-42-19-16, failure to warn, punitive damages, medical malpractice, violation of the Indiana Deceptive Consumer

Sales Act, Ind. Code §§ 24-5-0.5-1 *et seq.,* and battery. In opposing the instant motion for summary judgment, the Individual Defendants rely solely on the Lawsuits' allegations that the OSMC Defendants were negligent in selecting NECC as a supplier of preservative-free MPA, and in managing and overseeing that supplier relationship. (DE #70 at 7, 11, 12, 22, 23 n.5.) They summarize the Lawsuits' negligence allegations as follows:

1. OSMC was negligent in selecting and continuing to deal with NECC as the latter was operating illegally under its Massachusetts state license;

2. OSMC was negligent in that it should have known that NECC was operating as a bulk, mass manufacturer and as such, it could only lawfully operate pursuant to FDA authorization and regulation;

3. Apart from not being properly licensed or authorized by either the State of Massachusetts or the FDA, NECC was also not accredited by any compounding accreditation board or other similar organization[;]

4. OSMC also failed to perform reasonable, recommended and widely utilized due diligence in selecting NECC as a supplier of preservative-free MPA and failed to perform reasonable, recommended and widely utilized due diligence in the ongoing supplier relationship with NECC.

(DE #70 at 7 (citing DE #29-5 (Amended Complaint filed in *Alcozar v. Orthopedic and Sports Medicine Center of N. Ind.*, No. 20DO1-1404-CT-72 (Elkhart Sup. Ct.)).[3]

---

[3] The Individual Defendants cite the *Alcozar* Amended Complaint throughout their response brief as representative of the Lawsuits' complaints. (*See* DE #70 at 2 n.1, 2-7, 19 (citing DE #29-5).) The Court will do so as well.

The majority of the Individual Defendants also filed proposed complaints of medical malpractice against the OSMC Defendants with the Indiana Department of Insurance, *i.e.,* the Malpractice Complaints. The Malpractice Complaints allege similar claims of negligence, gross negligence, negligence per se, and medical malpractice.

<u>Westfield's Insurance Policies</u>

Westfield issued Commercial Package Policy No. TRA 3413228 to OSMC and ASC in September 30, 2011 ("Policy"), and renewed it annually twice thereafter, for coverage through September 30, 2014 (together, "Policies"). The Policies include commercial general liability ("CGL") bodily injury and property damage coverage ("BI/PD"). The BI/PD provision states in part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

(DE #29-1 at 154; DE #29-2 at 142; DE #29-3 at 136.) The Policies' commercial liability umbrella ("Umbrella") BI/PD states in relevant part:

> We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit"

seeking damages for such "bodily injury" or
"property damage" when the "underlying insurance"
does not provide coverage or the limits of
"underlying insurance" have been exhausted. . . .
[W]e will have no duty to defend the insured against
any "suit" seeking damages for "bodily injury" or
"property damage" to which this insurance does not
apply. . . .

(DE #29-1 at 293; DE #29-2 at 282; DE #29-3 at 281.) The BI/PD
and Umbrella BI/PD apply only if "[t]he 'bodily injury' or
'property damage' is caused by an 'occurrence'. . . ." (DE #29-1
at 154, 293; DE #29-2 at 142, 282; DE #29-3 at 136, 281.) The
Policies define "occurrence" as "an accident, including continuous
or repeated exposure to substantially the same general harmful
conditions." (DE #29-1 at 168, 308; DE #29-2 at 156, 297; DE #29-
3 at 150, 297.) The term "suit" is defined as "a civil proceeding
in which damages because of 'bodily injury,' 'property damage' or
'personal and advertising injury' to which this insurance applies
are alleged." (DE #29-1 at 169, 309; DE #29-2 at 157, 298; DE
#29-3 at 151, 298.) The term "bodily injury" is defined to include
bodily injury, sickness or disease sustained by a person, including
death resulting from any of these at any time.

The Policies also include personal and advertising injury
coverage ("PAI"), which states in part: "[w]e will pay those sums
that the insured becomes legally obligated to pay as damages
because of 'personal and advertising injury' to which this
insurance applies. . . ." (DE #29-1 at 159; DE #29-2 at 147; DE

#29-3 at 141.) The Umbrella PAI provision states in part, "[w]e will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'personal and advertising injury' to which this insurance applies. . . ." (DE #29-1 at 298; DE #29-2 at 287; DE #29-3 at 286.)

The Policies set forth several exclusions at issue in this matter. The BI/PD and Umbrella BI/PD include an "Expected Or Intended Injury" exclusion, which states that this insurance does not apply to "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured." (DE #29-1 at 155, 294; DE #29-2 at 143, 283; DE #29-3 at 137, 282.) By endorsement, the BI/PD includes an exclusion for "Services Furnished By Health Care Providers" ("Health Care Services Exclusion"). The Health Care Services Exclusion states in relevant part:

> With respect to any operation shown in the Schedule [which identifies "Medical & Orthopedics"], this insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of:
> 1. The rendering or failure to render:
> a. Medical, surgical, dental, x-ray or nursing service, treatment, advice or instruction . . .
> b. Any health or therapeutic service, treatment, advice or instruction; or . . .
> 2. The furnishing or dispensing of drugs. . . .

(DE #29-1 at 140; DE #29-2 at 128.)

The Umbrella BI/PD includes a "Professional Services" exclusion which states in relevant part that the insurance does not apply to:

> "Bodily injury" or "property damage" due to rendering or failure to render any professional service. This includes but is not limited to:
> . . .
> > (5) Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;
> >
> > (6) Any health or therapeutic service treatment, advice or instruction;
> > . . .
> > (11) Services in the practice of pharmacy. . . .

(DE #29-1 at 297; DE #29-2 at 286; DE #92-3 at 285-86.)

The OSMC Defendants requested that Westfield defend and indemnify them under the Policies against the Lawsuits and the Malpractice Complaints. Westfield denied coverage under the Policies, declined to defend the OSMC Defendants in the Lawsuits and Malpractice Complaints, and commenced this declaratory action.

<u>State Court Declaratory Judgment Action</u>

In October 2014, nearly all of the Individual Defendants filed a complaint for declaratory judgment in *Alcozar v. Orthopedic and Sports Medicine Center of Northern Indiana,* No. 20D01-1410-CT-216, in Elkhart Superior Court ("State DJ Action"). The complaint sought a declaration that the claims in the Lawsuits and Malpractice Complaints are subject to the Indiana Medical Malpractice Act ("MMA") and are covered by certain medical malpractice insurance policies. PCF intervened in the State DJ

Action, and the parties filed cross motions for summary judgment.
PCF argued that the negligence claims were not subject to the MMA.
The Elkhart Superior Court granted OSMC's and the plaintiffs'
motions for summary judgment, and denied PCF's motion for summary
judgment, holding that the claims fall within the scope of the
MMA. (DE #67-40 at 14, ¶34.) The court also held that OSMC's
medical malpractice insurer has a duty to defend and indemnify
OSMC, except to the extent that the medical malpractice policies
limit the insurer's liability. (*Id*. at 15, ¶¶39-40.) PCF filed
an interlocutory appeal of the ruling, which the Indiana Court of
Appeals recently affirmed in *Robertson v. Anonymous Clinic,* 63
N.E.3d 349 (Ind. Ct. App. 2016), *trans. denied*.[4]

DISCUSSION

The parties do not dispute that Indiana law governs the
coverage obligations and duties to defend arising from the
Policies. In Indiana, "[t]he interpretation of an insurance policy
is primarily a question of law for the court, and it is therefore

---

[4] In *Robertson,* PCF brought a consolidated interlocutory appeal of
the ruling in the State DJ Action, as well as a similar ruling in
an action brought in St. Joseph Superior Court in which other
injured patients (or those suing on their behalf) sued a medical
clinic in St. Joseph County that had injected patients with
contaminated MPA compounded by NECC. *See* 63 N.E.3d at 354 (noting
that six actions in St. Joseph Superior Court had been consolidated
under *In re Steroid Litigation*). Like the Elkhart Superior Court,
the St. Joseph Superior Court had ruled that the negligence claims
against the clinic were governed by the MMA. *Id*. The Court of
Appeals affirmed this ruling. *Id*. at 364.

a question which is particularly suited for summary judgment." *Wagner v. Yates,* 912 N.E.2d 805, 808 (Ind. 2009) (citation omitted). In an insurance policy dispute under Indiana law, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F. Supp. 3d 1015, 1023 (N.D. Ind. 2014) (citation omitted). "Generally speaking, contracts for insurance are subject to the same rules of construction as other contracts." *Id.* "[C]lear and unambiguous language in an insurance policy should be given its plain and ordinary meaning, even if those terms limit an insurer's liability." *Everett Cash Mut. Ins. Co. v. Taylor,* 926 N.E.2d 1008, 1012 (Ind. 2010) (internal citation omitted). "If the terms of a written contract are ambiguous, it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract." *Newnam Mfg., Inc. v. Transcon. Ins. Co.,* 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). Where policy language is ambiguous, Indiana courts generally construe it strictly against the insurer and in favor of the insured. *Taylor,* 926 N.E.2d at 1012 (citation omitted). However, where "a case involves a dispute between a third party and an insurer, the court does not construe [the policy] strictly against the insurer, but determines the general intent of the contract from a neutral stance." *Empire Fire v.*

*Frierson*, 49 N.E.3d 1075, 1079 (Ind. Ct. App. 2016) (citations omitted). "In addition, an ambiguity does not exist simply because an insured and an insurer disagree about the meaning of a provision, but only if reasonable people could disagree about the meaning of the contract's terms." *Id*. (citations omitted). Ultimately, "[t]he meaning of an insurance contract can only be gleaned from a consideration of all its provisions, not from an analysis of individual words or phrases. [The Court] must accept an interpretation of the contract language that harmonizes the provisions rather than the one which supports a conflicting version of the provisions." *Adkins v. Vigilant Ins. Co.,* 927 N.E.2d 385, 389 (Ind. Ct. App. 2010) (citations omitted). The power to interpret insurance policies does not extend to changing their terms; the Court will not give policies an unreasonable construction in order to provide additional coverage. *Id*.

Westfield argues that it has no duty under the Policies to defend or indemnify the OSMC Defendants for claims made in the Lawsuits and the Malpractice Complaints. An insurer's duty to defend is broader than its duty to indemnify. *Newnam Mfg., Inc.,* 871 N.E.2d at 401; *see Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.,* 917 N.E.2d 1258, 1267 (Ind. Ct. App. 2010) ("If the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed."). Indiana courts have determined that

an insurer's duty to defend is based on the allegations in the complaint and "those facts known or ascertainable by the insurer after reasonable investigation." *Newnam*, 871 N.E.2d at 401 (citation omitted). If the pleadings demonstrate that "a claim is clearly excluded under the policy, then no defense is required." *Id.*

## Issues Not In Dispute

Westfield's motion for summary judgment raises several issues that have been conceded by the Individual Defendants.[5] Westfield argues that no coverage exists for the Individual Defendants' claims under the PAI or Umbrella PAI coverage of the Policies. In response, the Individual Defendants concede that the PAI and Umbrella PAI are not applicable or relevant to their claims, and thus, do not provide coverage for their claims.

In addition, Westfield contends that the Policies do not provide coverage for the Individual Defendants' punitive damages claims, in part because courts have held that such coverage is void as against public policy. *See Exec. Builders, Inc. v. Motorists Ins. Cos.*, No. IP 00-0018-C-T/G, 2001 WL 548391, at *5

---

[5] The OSMC Defendants did not respond to Westfield's motion for summary judgment. *See* N.D. Ind. L.R. 56-1(b) ("A party opposing the motion must . . . file and serve (A) a response brief"). Their failure to respond results in a waiver of any arguments in opposition to the motion. *Nichols v. Michigan City Plant Planning Dep't,* 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

(S.D. Ind. Mar. 30, 2001) (noting "it is contrary to Indiana public policy to allow an insured to avoid liability for a punitive damage award by means of insurance where the insured is held directly liable for the acts giving rise to the punitive damage award"). Westfield also asserts that the Individual Defendants' fraud and misrepresentation claims are subject to the Policies' Expected Or Intended Injury Exclusion. *See United Servs. Auto. Ass'n v. Caplin,* 656 N.E.2d 1159, 1162 (Ind. Ct. App. 1995)(where the complaint sounded exclusively in intentional fraud, insurer was not required to defend the insureds under policies that "excluded coverage for expected or intended losses"). In response, the Individual Defendants concede that the Policies do not provide coverage for punitive damages or intentional acts, including fraud claims.

The Individual Defendants acknowledge that "Westfield's motion should be granted as to any claims asserting coverage under the Westfield PAI policy and as to any claims for punitive damages or for fraud or intentional tort." (DE #70 at 25.) Because Westfield and the Individual Defendants are in agreement, and the OSMC Defendants raise no objection, the Court holds that no coverage exists, and no duty to defend or indemnify arises, under the PAI and Umbrella PAI with respect to the Lawsuits and Malpractice Complaints. In addition, the Court holds that no coverage exists, and no duty to defend or to indemnify arises,

under the Policies with respect to any fraud and intentional tort claims, and any claims for punitive damages asserted in the Lawsuits and Malpractice Complaints.

The Medical Malpractice Complaints

Westfield maintains that it has no duty to defend the OSMC Defendants against the Malpractice Complaints because the BI/PD and Umbrella BI/PD limit the duty to defend to any "suit" seeking damages. (DE #29-1 at 154, 293; DE #29-2 at 142, 282; DE #29-3 at 136, 281.) The Individual Defendants filed the proposed Malpractice Complaints with the Indiana Department of Insurance pursuant to the MMA, Ind. Code § 34-18-1-1, *et seq*.[6] Under the MMA, the Malpractice Complaints will be addressed by a medical review panel ("panel"). *See* Ind. Code § 34-18-8-4 ("[A]n action against a health care provider may not be commenced in a court in Indiana before: (1) the claimant's proposed complaint has been presented to a medical review panel established under IC 34-18-10 . . . and . . . an opinion is given by the panel."). "The panel has the sole duty to express the panel's expert opinion as to whether or not the evidence supports the conclusion that the

---

[6] PCF, the Individual Defendants and Westfield maintain that the Court should decide the instant motion based on the language of Westfield's insurance policies, without interpreting the MMA. That being said, they do not raise concerns with the Court's consideration of MMA provisions relevant to determining whether the Malpractice Complaints are "suits" seeking damages under the Policies. The Court will consider the cited MMA provisions for this limited purpose.

defendant or defendants acted or failed to act within the appropriate standards of care as charged in the complaint." Ind. Code § 34-18-10-22(a). The panel does not have jurisdiction to award damages against the OSMC Defendants. (*See* DE #79, at 13-14 (PCF acknowledging that "the Medical Review Panel cannot award damages against the OSMC defendants").)

The Individual Defendants do not argue that the Malpractice Complaints are suits seeking damages. Rather, they respond that they filed negligence claims in Elkhart Superior Court, and that those Lawsuits qualify as suits seeking damages under the BI/PD and Umbrella BI/PD. Westfield acknowledges that if the panel determines that the OSMC Defendants failed to act within the appropriate standard of care, the Individual Defendants may bring a civil suit seeking damages against the OSMC Defendants. Because the panel cannot award damages to the Individual Defendants, the Malpractice Complaints do not qualify as suits seeking damages under the BI/PD or Umbrella BI/PD. Thus, the Court holds that no coverage exists, and no duty to defend or to indemnify arises, under the BI/PD and Umbrella BI/PD with respect to the Malpractice Complaints.

The Lawsuits

The Individual Defendants maintain that the BI/PD and Umbrella BI/PD provide coverage for the Lawsuits' claims of negligence by the OSMC Defendants. Westfield argues that these

claims are not covered by the BI/PD or Umbrella BI/PB because: (1) they do not allege an "accident" or "occurrence"; (2) they are excluded from coverage under the BI/PD's Health Care Services Exclusion; and (3) they are excluded from coverage under the Umbrella BI/PD's Professional Services Exclusion.[7]

### "Occurrence"

Westfield asserts that the Lawsuits' claims do not allege an "occurrence" as required by the BI/PD and the Umbrella BI/PD, but rather, allege professional errors or omissions. The BI/PD and Umbrella BI/PD provide coverage for damages for bodily injury caused by an "occurrence." The Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (DE #29-1 at 168, 308; DE #29-2 at 156, 297; DE #29-3 at 150, 297.) Indiana courts define "accident" as "an unexpected happening without an intention or design." *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1002 (Ind. 2009).

Westfield contends that Indiana courts recognize a difference between an accident/occurrence and a professional error or omission. An accident/occurrence is covered by CGL insurance,

---

[7] In their answer to Westfield's first amended complaint, the OSMC Defendants admit that the Lawsuits' complaints: (1) do not allege an "accident" or "occurrence" for purposes of the BI/PD and Umbrella BI/PD (DE #40 at 86, ¶4.19); (2) are subject to the Health Care Services Exclusion (*id.* at 84, ¶4.16); and (3) are subject to the Professional Services Exclusion (*id.* at 88, ¶4.27).

-21-

while a professional error or omission is covered by errors and omissions ("E&O") insurance. *See, e.g.*, *Tri-Etch,* 909 N.E.2d at 1002 (noting "the distinction between an 'occurrence' as the term is used in CGL policies, and claims based on 'commercial or professional conduct.' Claims based on negligent performance of commercial or professional services are ordinarily insured under 'errors and omissions' or malpractice policies.") (internal citation omitted); *Terre Haute First Nat. Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993) (holding bank's negligent administration of a guardianship was "professional relationship," not an "accident"); *Allstate Ins. Co. v. Preferred Fin. Sols., Inc.,* 8 F. Supp. 3d 1039, 1051 (S.D. Ind. 2014) (holding failures to deliver debt-reduction services in the manner required by Georgia law were business errors or omissions, not an "accidental event" covered by CGL policies); *U.S. Liab. Ins. Co. v. Parchman*, No. 1:11-cv-01244, 2013 WL 2600406, at *5 (S.D. Ind. Jun. 11, 2013) (holding party's failure to hire adequate security, maintain proper permits, or maintain the premises in a reasonably safe condition, was not an "accident" under a CGL policy).

In *Tri-Etch, Inc. v. Cincinnati Insurance Company*, a robber had abducted a liquor store employee before the store closed at midnight, tied him to a tree, and severely beat him. 909 N.E.2d at 999. The store's security service, which was to call the store

manager within thirty minutes if the alarm was not set at closing, did not call the manager until after 3:00 a.m. *Id*. The employee was found alive at 6:00 a.m., but later died from his injuries. *Id*. The employee's estate brought a wrongful death action alleging that the security service was negligent for failing to call the manager within thirty minutes, and that if the service had acted promptly, the employee would have been found earlier and survived. *Id*. One of the security service's insurers disputed its duty to defend and indemnify the security service against the wrongful death claim under CGL and umbrella policies. *Id*. at 999-1000. The policies defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 1001. The Indiana Supreme Court held that the security service's failure was not an "occurrence" covered by the policies, but rather, was a professional error analogous to lawyer malpractice:

> Lack of intentional wrongdoing does not convert every business error into an "accident." This failure is the same sort of claim as lawyer malpractice, or an insurance agent's failure to secure coverage as the client directed. 1 Couch on Insurance § 1:35 (3d ed. 2005) ("Within professional liability insurance, several different coverages are available . . . [including] errors and omissions (E & O) coverage protecting against liability based on the failure of the insured, in his or her professional status, to comply with what can be considered in simplistic terms to be the standard of care for that profession. . . ."). Tri-Etch's failure was just such an "error or omission," not an "accident," and for that reason it is not an "occurrence" covered by [the insurer's] CGL and umbrella policies. The CGL

policy does not guarantee the quality of work or products of its insureds.

909 N.E.2d at 1001. To the extent the security service had a duty to the store employee, it arose from its contract with the store, which "may give rise to tort liability. But it does not convert a failure to meet a standard of care under a contractually assumed duty into an 'accident.'" *Id*. (internal citation omitted).

The Individual Defendants do not address Westfield's assertion that the Lawsuits' negligence claims involve a professional error or omission. Relying upon *Sheehan Construction Company v. Continental Casualty Company*, 935 N.E.2d 160 (Ind. 2010), they maintain that the Lawsuits allege negligence and injury falling within the terms "accident" or "occurrence" under the Policies. In *Sheehan*, homeowners sued a general contractor for negligent construction of their homes. The contractor had hired subcontractors who performed the allegedly negligent work. The CGL policies at issue insured Sheehan against liability for "property damage" caused by an "occurrence," which was defined as "an accident, including continuous exposure to substantially the same general harmful conditions." *Id*. at 170. Sheehan's insurer filed an action seeking a declaration that it had no duty to indemnify Sheehan. *Id*. at 164. The trial court ruled in favor of the insurer in part because it found no "occurrence" under the policies. *Id*. The Indiana Supreme Court disagreed, explaining:

> The question presented is whether faulty workmanship is
> an accident within the meaning of a standard CGL policy.
> In our view the answer depends on the facts of the case.
> For example, faulty workmanship that is intentional from
> the viewpoint of the insured cannot be an "accident" or
> an "occurrence." On the other hand if the faulty
> workmanship is "unexpected" and "without intention or
> design" and thus not foreseeable from the viewpoint of
> the insured, then it is an accident within the meaning
> of a CGL policy.

935 N.E.2d at 170. *Sheehan* does not address the distinction

between an accident and a professional error or omission, but cites

*Tri-Etch* with approval, indicating that the Indiana Supreme Court

did not intend to call its decision in *Tri-Etch* into question.

*See id*.

The Individual Defendants maintain that, like the contractor

in *Sheehan* who hired subcontractors to do the allegedly negligent

construction work, "OSMC in effect hired NECC to compound

preservative-free MPA, which OSMC then purchased from NECC." (DE

#70 at 21.) They contend that the alleged injuries constitute an

"accident" under the Policies because they were "unexpected" and

"without intention or design" by the OSMC Defendants. (*Id.*)

However, "[l]ack of intentional wrongdoing does not convert every

business error into an 'accident.'" *Tri-Etch*, 909 N.E.2d at 1001.

The Court finds the Lawsuits' claims are more akin to those

in *Tri-Etch* than those in *Sheehan*. The Lawsuits allege a

professional relationship between the OSMC Defendants, who "are

engaged in the business of providing health care," and the patients

to whom they administered the epidural MPA injections. (DE #70 at 2.) They allege that the OSMC Defendants were negligent in selecting NECC to supply preservative-free MPA and in managing that supplier relationship, in part by failing to perform "recommended and widely utilized due diligence." (*Id*. at 7.) Dr. Grove, the medical director for ASC and an OSMC physician, testified that the decision to use preservative-free MPA compounded by NECC was a "medical decision" and a "medical judgment" made by physicians on ASC's board of directors. (DE #67-3 at 30-31.) ASC's board of directors decided to switch from administering preservative-based MPA to preservative-free MPA based on concerns for patient safety. The board considered ASC's pharmacist consultants' vetting of NECC as a supplier, and approved the continued use of preservative-free MPA in annual reviews. It is reasonable to infer that these decisions involved a professional standard of care. *See Robertson,* 63 N.E.3d at 362 ("It is reasonable to assume that OSMC weighed the potential benefits of using preservative-free MPA from NECC against the potential risks and determined that purchasing the medication from NECC was a reasonable approach. This decision is obviously one that was made using professional judgment."). The OSMC Defendants' alleged negligence in making these decisions is "based on the failure of the insured, in his or her professional status, to comply with .

. . the standard of care for that profession." *Tri-Etch*, 909 N.E.2d at 1001 (quoting 1 Couch on Insurance § 1:35).

The failure to meet a standard of care under a contractually assumed duty is not an "accident." *Tri-Etch*, 909 N.E.2d at 1001; *see Allstate Ins. Co.,* 8 F. Supp. 3d at 1050 ("a business's failure to perform its services in the manner it had promised is an 'error or omission' but not by any stretch an 'accident'"). Although the OSMC Defendants "did not intentionally commit wrongdoing, this failure does not convert [their] actions into an 'accident.'" *Parchman*, 2013 WL 2600406, at *5 (finding insured's alleged negligence in failing to hire adequate security, maintain proper permits, and maintain the premises in a reasonably safe condition was "commercial or professional," and "not 'an unexpected happening without intention or design'"). The Lawsuits' negligence claims allege a professional error or omission, rather than an accident or occurrence. The Court therefore finds that the Lawsuits' claims that the OSMC Defendants were negligent in selecting NECC as a supplier of preservative-free MPA and in managing that supplier relationship do not allege an "accident" or "occurrence" under the BI/PD or Umbrella BI/PD.[8]

---

[8] Westfield also argues that the Lawsuits' negligence claims are not covered by the BI/PD or Umbrella BI/PD because the selection and purchase of MPA from NECC does not satisfy the requirement of a direct causal connection between an alleged occurrence and bodily injury. *See Huntzinger v. Hastings Mut. Ins. Co.,* 143 F.3d 302 (7th Cir. 1998). Because the Court has determined that these

Exclusions from Coverage

Even if the Lawsuits' negligence claims were to allege an
"accident" or "occurrence" under the BI/PD and Umbrella BI/PD,
these claims are excluded from coverage under the BI/PD's Health
Care Services Exclusion and the Umbrella BI/PD's Professional
Services Exclusion.  *See Tri-Etch*, 909 N.E.2d at 1004 (holding
that "[a]part from the fact that Tri-Etch's error does not qualify
as an 'occurrence,' there is no coverage" because the insured's
actions fell "squarely within exclusions of the umbrella policy").
A coverage exclusion is usually an affirmative defense, with the
insurer bearing the burden of proof.  *Hoosier Ins. Co. v. Audiology
Found. of Am.,* 745 N.E.2d 300, 309 (Ind. Ct. App. 2001).
"Generally, insurers are allowed to limit liability in any manner
which is not inconsistent with public policy."  *Id.*  "[A]n
unambiguous exclusionary clause is ordinarily entitled to
enforcement."  *Id.*  However, exclusions must be plainly expressed
in the policy, and any doubts as to coverage will be construed
against the insurer.  *Id*.

Westfield maintains that Indiana courts analyze the
"efficient and predominate cause" of the injuries to determine
whether claims are subject to policy exclusions.  In *Wright v.*

---

claims do not allege an occurrence under the BI/PD or Umbrella
BI/PD, it need not address the application of *Huntzinger* to this
matter.

*American States Insurance Company*, 765 N.E.2d 690 (Ind. Ct. App. 2002), one child died and another was injured while riding in a van being driven by a daycare center employee when the van was involved in a collision. The court held that an auto-use exclusion in the daycare center's CGL policy excluded coverage for a claim of negligent supervision, explaining:

> the efficient and predominating cause of the injuries was [the driver's] use of the van. Without the use of the van, there would be no lawsuit. [The injured parties] are not alleging that [the daycare center's] failure to investigate [the driver's] driving record, or its employment of an incompetent driver with a suspended license was a separate or independent proximate cause of the harm. The immediate and efficient cause of [the children's] injuries and the [injured parties'] claims arising from those injuries is [the driver's] use of the automobile.

*Id*. at 697; *see Ill. Farmers Ins. Co. v. Wiegand*, 808 N.E.2d 180, 190 (Ind. Ct. App. 2004) (holding that a policy containing a motor vehicle exclusion barred coverage for a negligent supervision claim because the "immediate and efficient cause" of the minor's injuries and the claims arising from those injuries was the minor's use of the ATV, "and without the use of the ATV, there would be no claim for negligent supervision"); *Property-Owners Ins. Co. v. Ted's Tavern, Inc.*, 853 N.E.2d 973, 983 (Ind. Ct. App. 2006) (holding that a liquor liability exclusion in a CGL policy excluded coverage for negligent hiring, training and supervision claims where "the immediate and efficient cause of the injuries was drunk driving precipitated by the negligent service of alcohol");

*Westfield Ins. Co. v. Hill*, 790 F. Supp. 2d 855, 866 (2011) (finding that homeowners insurance policy containing an exclusion for sexual molestation and physical abuse precluded coverage of negligent supervision and failure to warn claims where "the efficient and predominant cause of Doe's injuries was Comford's sexual molestation and physical abuse").

Westfield contends that the "efficient and predominate cause" of the Individual Defendants' injuries was the OSMC Physicians' injection of contaminated MPA into the patients' bodies. The Individual Defendants allegedly suffered injuries due to the OSMC Defendants' administration of contaminated MPA to patients. (*See, e.g.*, DE #29-5 at 34, ¶163 (alleging plaintiffs suffered injury or death "due to their receiving contaminated NECC drugs purchased by OSMC"), ¶164 (alleging surviving plaintiffs have suffered and will continue to suffer injuries "as a direct result of being exposed to NECC's Contaminated Drugs").) Several Individual Defendants admit that they would not have suffered any of their alleged injuries or damages if they or their decedents had not received injections of contaminated MPA. (*See* DE #67-2 ¶5.1 (citing DE #67-6 – #67-30 (Individual Defendants' responses to Westfield's First Set of Interrogs.).)

The Individual Defendants do not dispute that Indiana courts apply the "efficient and predominating cause" analysis to determine whether a policy excludes coverage for a claim. Nor do

they deny that they would not have suffered any of the injuries or damages alleged in the Lawsuits if patients had not been injected with contaminated MPA.  They argue that Westfield mischaracterizes their negligence claims as based on the injections of contaminated MPA, and assert that the negligence that caused the harm was the OSMC Defendants' "failure to select a compliment [*sic*] and legally operating supplier of preservative free MPA and its negligence in overseeing the relationship with that supplier."  (DE #70 at 23 n.5.)  But the Individual Defendants do not assert that the Lawsuits allege any injury that is separate or independent from the injury caused by the injection of the contaminated MPA into the patients' bodies.  *See Hill*, 790 F. Supp. 2d at 866 (efficient and predominating cause of the injury was acts of molestation where the complaint did not allege tortious conduct that was "divorced from [the molester's] actions" or "assert any claim for damages . . . independent of the injuries caused by [the molester's] actions"); *Wright*, 765 N.E.2d at 697 (efficient and predominating cause of the injuries was the use of the van where the injured parties did not allege that the insured's failure to investigate the driver's record or its employment of an incompetent driver "was a separate or independent proximate cause of the harm").  "Although the [OSMC Defendants'] actions or omissions could have contributed in some way," it is undisputed that the Individual Defendants would have no injury without the injections of

contaminated MPA into the patients' bodies. *Hill*, 790 F. Supp. 2d at 866. Without the injections, "there would be no damages, no lawsuit and no negligence claim." *Id*. Therefore, the efficient and predominant cause of the Individual Defendants' injuries was the injection of the contaminated MPA into the patients' bodies.

<u>Health Care Services Exclusion</u>

The BI/PD's Health Care Services Exclusion provides that the insurance does not apply to bodily injury "arising out of . . . [t]he rendering or failure to render . . . [m]edical . . . or nursing service [or] treatment", "health or therapeutic service [or] treatment", or "[t]he furnishing or dispensing of drugs." (DE #29-1 at 140; DE #29-2 at 128; DE #29-3 at 125.) Westfield maintains that this exclusion eliminates coverage of the Lawsuits' negligence claims because the efficient and predominant cause of the Individual Defendants' injuries, *i.e.,* the injection of contaminated MPA into the patients' bodies, constitutes the rendering of a medical, nursing, health or therapeutic service or treatment, or the furnishing of drugs.

The Individual Defendants contend that the term "treatment" in the exclusion is ambiguous as it applies to this case. "Terms in a contract are given their usual and common meaning unless, from the contract, it can be determined some other meaning was intended." *Westfield Cos.*, 804 N.E.2d at 1274. "Treatment" is not defined in the Policies. The American Heritage Dictionary of

the English Language defines "treatment" in part as "[t]he use of an agent, procedure, or regimen, such as a drug, surgery, or exercise, in an attempt to cure or mitigate a disease, condition, or injury." https://ahdictionary.com/word/search.html?q=treatment (last visited on Mar. 14, 2017). The Individual Defendants admit that "a reasonable interpretation of the policy term 'treatment' is that it means the performance of the medical treatment – here that being the injection." (DE #70 at 16.) They insist that the Lawsuits do not allege that the OSMC Defendants were negligent in performing the injections; rather, the Lawsuits allege the OSMC Defendants were negligent in selecting NECC as a supplier of preservative-free MPA and in managing that supplier relationship. The Individual Defendants argue that because the term "treatment" is ambiguous in this context, the Health Care Services Exclusion should be construed in favor of the insured and in favor of finding coverage.

While Indiana courts have not addressed the Health Care Services Exclusion, other jurisdictions have found such exclusions to be unambiguous and apply to similar claims. *See Maryland Cas. Co. v. Florida Atl. Orthopedics, P.L.,* 771 F. Supp. 2d 1328, 1332-33 (S.D. Fla. 2011) (holding health care services exclusion was not ambiguous); *Colony Ins. Co. v. Suncoast Med. Clinic, LLC*, 726 F. Supp. 2d 1369, 1376-77 (M.D. Fla. 2010) (holding that a medical services exclusion barred coverage for claims alleging a failure

to have in place adequate policies, procedures, staff and assistive technology to ensure performance of diagnostic tests and communication between medical personnel because they were "an intricate part of the medical services provided"); *Alayon Del Valle v. Kenyon*, No. CIV. 06-2105CCC, 2009 WL 3299373, at *3 (D.P.R. Oct. 9, 2009) (holding that a health care services exclusion in a CGL policy barred coverage for claims alleging tortfeasor was responsible for quality management, patient safety, providing physician training and credentialing, utilizing management and medical policies, and establishing and implementing adequate procedures, because they were "duties directly involved in the provision of services and require the application of medical expertise"); *Duncanville Diagnostic Center, Inc. v. Atlantic Lloyd's Ins. Co. of Texas,* 875 S.W.2d 788, 792 (Tex. Ct. App. 1994) (holding that a health care services exclusion in a CGL policy excluded coverage for claims of negligently administering a sedative, improperly hiring and training the technicians who administered the drugs, and failing to institute adequate policies and procedures). The plain language of the Health Care Services Exclusion eliminates coverage for bodily injury arising out of the rendering of a medical, nursing, health or therapeutic service or treatment, or the furnishing or dispensing of drugs. While the Individual Defendants argue the term "treatment" does not clearly apply to the Lawsuits' negligence claims, they concede that a

reasonable interpretation of "treatment" is "the performance of the medical treatment – here that being the injection." (DE #70 at 16.) The fact that patients signed consent forms to receive a medical procedure before being injected with preservative-free MPA also supports the conclusion that the injections constituted medical treatment. Thus, the issue is whether the Lawsuits' negligence claims are excluded from coverage based on the rendering of the medical treatment of MPA injections.

As discussed above, the "efficient and predominate cause" of the injuries alleged in the Lawsuits is the injection of contaminated MPA into the patients' bodies. While the Lawsuits allege the OSMC Defendants were negligent in selecting NECC as a supplier of preservative-free MPA and in managing that supplier relationship, "creative pleading . . . cannot hide the reality that the immediate and efficient cause of the injuries" was the injection of the contaminated MPA. *Property-Owners*, 853 N.E.2d at 983; *see Hill*, 790 F. Supp. 2d at 866 (finding sexual molestation exclusion barred coverage even though the injuries were "frame[d] . . . in the language of negligent supervision and failure to warn"). Without the injections, there would be no injuries, no Lawsuits, and no negligence claims. Because the injections are the efficient and predominate cause of the alleged injury, and the injections clearly constitute medical "treatment," the Health Care Services Exclusion eliminates coverage of the Lawsuits' claims of

negligence in selecting NECC as a supplier of preservative-free MPA and in managing that supplier relationship. Therefore, the Court holds that no coverage exists, and no duty to defend or to indemnify arises, under the BI/PD with respect to the negligence claims asserted against the OSMC Defendants in the Lawsuits.

Professional Services Exclusion

The Umbrella BI/PD's Professional Services Exclusion provides that the insurance does not apply to bodily injury "due to rendering . . . any professional service," which includes "[m]edical . . . or nursing service [or] treatment," "[a]ny health or therapeutic service [or] treatment," and "[s]ervice in the practice of pharmacy." (DE #29-1 at 297; DE #29-2 at 286; DE #29-3 at 285-86.) The Umbrella BI/PD does not define "professional service." Westfield asserts that the "efficient and predominating cause" of the Individual Defendants' injuries, *i.e.,* the injection of contaminated MPA into the patients' bodies, eliminates coverage of the Lawsuits' negligence claims under this exclusion. Westfield also maintains that this exclusion eliminates coverage because the negligence claims are based on acts taken by the OSMC Defendants in the course of providing professional services.

The plain language of the Professional Services Exclusion eliminates coverage for bodily injury due to medical, nursing, health, or therapeutic service or treatment. Other courts have found professional services exclusions to be unambiguous. *See,*

*e.g., Maryland Cas. Co.,* 771 F. Supp. 2d at 1332-33 (holding that professional services exclusion was not ambiguous); *see also Nat'l Fire Ins. Co. of Hartford v. Kilfoy,* 874 N.E.2d 196, 201-02 (Ill. Ct. App. 2007) (holding that professional services exclusion excluded coverage of claims of negligent hiring, administrative supervision, and business operation of a surgical facility); *Duncanville Diagnostic Center,* 875 S.W.2d at 790-92 (holding that professional services exclusion in a CGL policy excluded coverage for claims of negligently administering a sedative, improperly hiring and training the technicians who administered the drugs, and failing to institute adequate policies and procedures).

The Individual Defendants maintain that the term "treatment" in the Professional Services Exclusion as applied here is ambiguous, and that such ambiguity should be construed against Westfield. They cite *Burton v. Choctaw County,* 730 So. 2d 1 (Miss. 1997), in which the court found the term "nursing treatment" in a professional services exclusion of a CGL policy to be ambiguous. *Id*. at 8. The court found that "[r]easonable people could easily differ about whether various actions constitute 'treatment,' and just as easily, they could differ about whether those 'treatments' constitute 'professional services.'" *Id*. The *Burton* court held that the question of whether the tortfeasor's actions "constituted 'nursing treatment' should have been submitted to a jury in the face of the ambiguity." *Id*. at 9. While the Individual Defendants

contend that an ambiguity arises as to whether "treatment" includes the OSMC Defendants' alleged negligence in selecting NECC as a supplier of preservative-free MPA and in managing that supplier relationship, they concede that a reasonable interpretation of "treatment" is "the performance of the medical treatment – here that being the injection." (DE #70 at 16.)

As explained above, Indiana courts consider the "efficient and predominating cause" of the injury to determine whether an exclusion eliminates coverage under a policy. The Court has found that the efficient and predominating cause of the injuries alleged in the Lawsuits was the injection of contaminated MPA into the patients' bodies. Because the injections indisputably constitute the rendering of a medical service or "treatment," the Lawsuits' negligence claims are excluded from coverage under the Professional Services Exclusion.

Even if the Court were to disregard the efficient and predominating cause of the alleged injuries, the Professional Services Exclusion would still eliminate coverage of the Lawsuits' negligence claims. In *Erie Insurance Group v. Alliance Environmental, Inc.*, 921 F. Supp. 537 (S.D. Ind. 1996), the court considered a CGL policy that excluded coverage for liability for damages due to "any service of a professional nature." *Id.* at 541. The court stated that when determining whether alleged wrongs are within the scope of a professional services exclusion, "the

focus must be on whether the claimant is seeking to impose liability for acts which were taken in the course of providing professional services and which drew upon (or at least should have drawn upon) the professional's training, skill, experience, or knowledge." *Id*. at 543. The court explained:

> not every action a professional takes in the course of providing professional services will be a professional service for insurance purposes, but that when the professional draws upon (or at least should draw upon) his or her professional knowledge, experience, and training in taking some action, that is a professional service for insurance purposes.

*Id*. at 545-46 (citing *Collins v. Covenant Mut. Ins. Co.*, 604 N.E.2d 1190 (Ind. Ct. App. 1992), *vacated on other grounds*, 644 N.E.2d 116 (Ind. 1994)). Thus, when "the insured is being sued for taking actions in the course of providing professional services, and where those actions both are reasonably related to the services being provided and involve the use of (or failure to use) professional knowledge, skill, experience, or training, the 'professional services' exclusion applies." *Id*. at 547.

The Individual Defendants rely upon case law from other jurisdictions to argue that medically related conduct does not constitute "professional services." Like *Erie*, those courts generally considered whether the alleged conduct required specialized skill and training in determining whether a professional services exclusion eliminated coverage. *See Jefferson Ins. Co. of N.Y. v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh, Pa.,* 677 N.E.2d 225, 230-31 (Mass. Ct. App. 1997) (ambulance company's delay in responding to a medical emergency due to a miscommunication regarding the emergency's location did not constitute "professional services" because it was "nonspecialized, clerical or administrative activity requiring neither special learning, intellectual skill, nor professional judgment"); *Duke Univ. v. St. Paul Fire & Marine Ins. Co.,* 386 S.E.2d 762 (N.C. Ct. App. 1990) (negligent failure to lock casters on a dialysis chair not within the term "professional services"); *Guaranty Nat'l Ins. Co. v. North River Ins. Co.,* 909 F.2d 133, 136 (5th Cir. 1990) (professional services exclusion did not bar coverage of a negligence claim for placing psychiatric patient in an "open" fourth floor room who jumped through a window to her death because "[t]he decision to protect the open unit patients through screws in the window sashes rather than through fixed, protective screens over the windows . . . was not a professional, medical decision"); *Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.,* 142 F.3d 512, 514 (1st Cir. 1998) (fee-setting and billing was not "a professional service" under an E&O policy).

Here, the evidence demonstrates that the OSMC Defendants' selection of NECC as their supplier of preservative-free MPA and management of that supplier relationship was (1) reasonably related to the medical services being provided, and (2) involved

-40-

the use of (or failure to use) professional knowledge, skill, experience, or training. *See Erie Ins. Grp.,* 921 F. Supp. at 547. It is undisputed that the OSMC Defendants provided medical services to patients in the form of epidural MPA injections. ASC's board of directors, consisting of 11 physicians and ASC's CEO, made the decision to switch from administering preservative-based MPA to preservative-free MPA based on concerns for patient safety, and conducted annual reviews in which they approved the continued use of preservative-free MPA. ASC's pharmacist consultants vetted NECC as a supplier of certain medications, and ASC's board of directors made the decision to use NECC as a supplier. Dr. Grove testified that the decision to use preservative-free MPA compounded by NECC was a "medical decision" and a "medical judgment" made by physicians on ASC's board of directors. (DE #67-3 at 30-31.) It is reasonable to assume that ASC's board of directors relied on the physicians' knowledge, skill, experience and training in making this medical decision. The Court notes that the Court of Appeals also had "little trouble concluding that the selection of preservative-free MPA—in particular, preservative-free MPA made by NECC—in favor of MPA with preservatives from other suppliers, were actions that involved the exercise of professional medical skill and judgment." *Robertson,* 63 N.E.3d at 361; *see id.* at 364 (holding that claims "that Defendants were allegedly negligent . . . in choosing NECC without

proper vetting, are allegations that claim negligence in decisions that were made using professional expertise").

The OSMC Defendants' selection of NECC as their supplier of preservative-free MPA and management of that supplier relationship was reasonably related to the medical service of administering preservative-free MPA injections to patients, and involved the use of the physicians' professional knowledge, skill, experience, and/or training. Therefore, the Professional Services Exclusion eliminates coverage of the Lawsuits' claims that the OSMC Defendants were negligent in selecting NECC as their supplier of preservative-free MPA and in managing that supplier relationship. The Court holds that no coverage exists, and no duty to defend or to indemnify arises, under the Umbrella BI/PD with respect to the negligence claims asserted against the OSMC Defendants in the Lawsuits.

CONCLUSION

For the reasons set forth above, Westfield's Motion for Summary Judgment (DE #64) is **GRANTED.** The Clerk of the Court is **DIRECTED** to enter a **DECLARATORY JUDGMENT** in favor of Westfield and against all defendants declaring that no coverage exists under Commercial Package Policy No. TRA 3413228 based on the personal and advertising injury, umbrella personal and advertising injury, bodily injury and property damage, and umbrella bodily injury and property damage coverage provisions, and thus, Westfield has no

duty to defend or indemnify defendants OSMC, ASC, or OSMC Physicians with respect to the claims asserted by the Individual Defendants in the Lawsuits filed in Elkhart Superior Court and the Medical Malpractice Complaints filed with the Indiana Department of Insurance.

DATED: March 28, 2017            /s/ RUDY LOZANO, Judge
                                              United States District Court